**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**LANETTE D. MOORE,**

      **Plaintiff,**

                                    **Civil Action 2:17-cv-0144**
                                    **Chief Magistrate Judge Elizabeth P. Deavers**

  **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Lanette D. Moore, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for supplemental social security income and disability insurance benefits. This matter is before the Court for disposition based upon the parties' full consent (ECF Nos. 12, 13), and for consideration of Plaintiff's Statement of Errors (ECF No. 18), the Commissioner's Memorandum in Opposition (ECF No. 22), and the administrative record (ECF No. 9). Plaintiff has not filed a reply memorandum. For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I. BACKGROUND

Plaintiff filed her applications for benefits on May 2013, alleging that she has been disabled since March 22, 2012[1], due to Chiari malformation/brain surgery, a back injury, migraine headaches, and syrinx. (R. at 316–23, 324–30, 364.) Plaintiff's applications were denied

---

[1]Plaintiff later amended her alleged onset date of disability to June 4, 2012, based on when she first complained of headaches. (R. at 152, 435.)

initially and upon reconsideration. (R. at 249–55, 261–72.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 273–79.)

Administrative Law Judge Paul E. Yerian ("ALJ") held a hearing on January 15, 2016, at which Plaintiff, represented by counsel, appeared and testified, along with Richard P. Oestreich, Ph.D., a vocational expert. (R. at 154–84.) On February 25, 2016, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 126–40.) On February 2 and 15, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–7, 8–14.) Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony[2]

Plaintiff, who was thirty years old at the time of the administrative hearing, testified that she is married with three minor children. (R. at 154.) They live in a one-story house with a basement. (R. at 155.) Plaintiff has a driver's license and drives about four times a week for about ten minutes to drop her nephew off at school. (R. at 156.)

Plaintiff testified that she had headaches before 2012, but they "really started getting bad" in 2012 and she decided to pursue testing due to her family history. (R. at 161–62.) She described those headaches as "crippling." (R. at 162.) The headaches would come and go and were not consistent. (R. at 163.) Plaintiff experienced headaches three to four times a week and later the frequency increased to six or seven times a week with numbness in her left arm. (R. at

---

[2]The Court limits its analysis of the hearing testimony and medical evidence to the issues raised in Plaintiff's Statement of Errors.

163–64.)   She saw a specialist who recommended surgery.   (*Id.*)

Plaintiff initially had relief from her headaches for the first couple of months following her September 2012 surgery but her headaches "started coming back[.]"   (R. at 165.)   The headaches worsened in severity and increased in frequency.   (R. at 165–66.)   She experienced headaches anywhere from three to seven times a week, and the headaches lasted anywhere from one to twenty-six hours.   (R. at 166.)   Plaintiff testified that she hadn't "really noticed any triggers." (*Id.*)   When asked about her symptoms, Plaintiff replied that she experienced light sensitivity, sound sensitivity, nausea, and dizzy spells.   (*Id.*)   Plaintiff testified that she initially benefited from medications, but then the medication "didn't work anymore" and would make her dizzy or lightheaded.   (R. at 167.)   Plaintiff testified that even with her new medication, she still has migraines about five times a week, lasting anywhere from an hour to six hours.   (R. at 171.) When she experiences a headache, she feels dizzy and nauseous, but does not vomit.   (R. at 171–72.)   When she has a headache, she goes from sitting to lying down, tries to take a walk, runs cold water on her head.   (R. at 171.)   After the headache passes, she feels very tired and dizzy and has trouble focusing for two to three hours afterwards.   (R. at 172.)

When asked about being able to take care of her children when she was experiencing a headache, she explained that if her husband was home, she would lie down in a dark room with an ice pack on her head.   (R. at 170.)   If she is home alone, she would "force" herself to stay up. (*Id.*)

During a typical day, Plaintiff gets up at 7:00 a.m. and gets her kids ready for school, talking them to the bus stop about ten to fifteen steps from her home.   (R. at 175.)   She sits in the living room with a heating pad with her feet elevated.   (*Id.*)   She will try and do the dishes and

then sit back down again for about ten to fifteen minutes before trying to pick up the mess the kids made.  (*Id.*)  Plaintiff testified to performing these household chores for only fifteen to twenty minutes at a time, rotating from sitting to chores.  (*Id.*)  She picks her kids up from the bus stop around 2:00 p.m. or 2:30 p.m. and tries to help them with their homework, sitting or standing with them off and on.  (R. at 175–76.)  Plaintiff's husband does the cooking.  (R. at 176.)  Plaintiff's husband and children do the grocery shopping and she goes with her husband to the grocery store about twice a month and has to hold onto the cart.  (*Id.*)  Plaintiff and her family have two cats and three turtles and she takes care of the turtles, which is "very easy."  (R. at 177.)  Plaintiff likes to watch television and read.  (*Id.*)  She reads about once a month.  (*Id.*)  Plaintiff also tries to play board games with her children, but can do so for only twenty or thirty minutes before she gets a headache and has to stop.  (R. at 177–78.)  She has a smart phone and gets on Facebook about four times a week and texts her mother every day.  (R. at 178.)  Plaintiff attends parent-teacher conferences twice a year, which each lasted twenty minutes.  (R. at 179.)  She also attended a Christmas school program that lasted forty-five minutes.  (*Id.*)

## B.  Vocational Expert Testimony

The Vocational expert ("VE") testified at the administrative hearing that Plaintiff's past relevant employment as a cheese making laborer, was classified as a medium exertion, unskilled job.  (R. at 181.)  Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could not perform Plaintiff's past work, but could perform 370,000 sedentary jobs in the national economy such as a hand packer, sorter, or inspector.  (R. at 182.)

The VE also testified that typical absenteeism is permitted up to one day a month. (R. at 183.) According to the VE, a typical employer will not tolerate more than 10% time spent off task. (*Id*.) The VE further testified that if a hypothetical individual was away from her work station for approximately 60 minutes for a headache recovery period, she would not be able to maintain competitive employment. (*Id.*)

### III.    MEDICAL RECORDS

#### A.    Marsha Mitchell, CNP

On June 4, 2012, Plaintiff presented for examination to Marsha Mitchell, CNP, reporting headaches, dizziness, and photophobia. (R. at 629.) CNP Mitchell noted that Plaintiff reported that cold compresses and darkness alleviated the pain. (*Id*.) CNP Mitchell assessed dizziness, headache, and tension headache. (R. at 631.)

On July 2, 2012, Plaintiff followed up with CNP Mitchell, reporting daily headaches with a 10/10 intensity that last five to eight hours. (R. at 619.) Plaintiff reported bending forward and not having her own pillow to sleep trigger the migraines, but that they "tend to occur with no specific pattern and are . . . accompanied by photophobia and phonophobia." (*Id*.) Plaintiff, however reported that rest and pain medication alieve the pain. (*Id*.) CNP Mitchell assessed a tension headache. (R. at 621.)

#### B.    Martha Brogan, M.D.

On June 15, 2012, Martha Brogan, M.D., performed a brain MRI, which revealed cerebellar tonsils extended through the foramen magnum to the level of the ring of C1 and demonstrated a pointed configuration, the volume of the posterior fossa and fourth ventricle were diminished, and the possible presence of a syrinx cavity in the proximal cervical spinal cord

visualized only on the sagittal T1 weighted sequence limiting intrinsic spinal cord detail. (R. at 680.) Dr. Brogan diagnosed Plaintiff with Chiari malformation with a questionable cervical syrinx. (*Id*.)

## C.    Francis Castellano, M.D.

A July 3, 2012, Francis Castellano, M.D. performed a MRI of the cervical spine. The MRI showed loss of normal cervical lordosis, an extension of the cerebellar tonsils approximately 7mm below the level of the foramen magnum, a cervical spine syrinx extending from C5 to T2, and a second component of the syrinx at the T4 level. (R. at 677.) Dr. Castellano assessed Plaintiff with Chiari malformation with resulting cervical spine syrinx from C5 to T1 measuring 3.5x5mm by transverse dimension at the C6 level, and a second smaller component of the syrinx in the upper thoracic spine at the T4 level. (R. at 678.)

Dr. Castellano performed another MRI of the thoracic spine on July 7, 2012, which revealed a cervicothoracic syrinx which extended to the T1 level, and a second component of the thoracic spine syrinx extending form T3-T5. (R. at 674.) Dr. Castellano assessed redemonstration of a cervicothoracic syrinx from the C5 to T1 levels measuring 5mm in transverse dimension, and a second smaller thoracic component of the syrinx from the T3 to T5 measuring 3mm in transverse dimension. (*Id*.)

## D.    Anne Nickerson, LISW-S

On July 30, 2012, Plaintiff presented to Anne Nickerson, LISW-S, for a diagnostic assessment upon referral by CNP Mitchell. (R. at 615–17.) Plaintiff reported increased depression over family issues. (R. at 616.) Ms. Nickerson assessed Plaintiff with compression of the brain — Chiari malformation with multiple syrinx. (R. at 617.)

**E.     Siyun Li, M.D.**

Siyun Li, M.D., a neurologist, examined Plaintiff on August 9, 2012.   (R. at 573–75.)
Plaintiff reported that her headaches typically last two hours if treated and all day long if not
treated.   (R. at 573.)   Plaintiff rated her headaches a 7/10 in severity and that they "limit some
normal activity."   (*Id*.)   Plaintiff reported associated symptoms, including sensitivity to light or
sound, nausea, vomiting, balance difficulty, dizziness, watery eyes, seeing blind spots, weakness,
confusion, fatigue and that bending over, straining, coughing, and walking up stairs aggravate her
headaches.   (*Id*.)   Plaintiff also reported experiencing transient blurred vision a few times a week.
(*Id*.)   Dr. Li assessed multiple lesions within the cervical spinal cord and thoracic spinal cord.
(R. at 574.)   Dr. Li noted that Plaintiff was experiencing increased neurological complaints and
"[t]herefore, surgical intervention appears necessary."   (*Id*.)   Dr. Li referred Plaintiff to Robert
Gewitz, MD.   (*Id*.)

Plaintiff followed up with Dr. Li on May 22, 2013.   (R. at 570–71.)   Dr. Li noted that
Plaintiff posterior fossa decompression surgery performed by Robert Gewirtz in September 2012
"has been very successful."   (R. at 570.)   However, Plaintiff reported that over the last few
months she experienced some increasing frequency of headaches as well as left arm numbness.
(*Id*.)   Her physical examination findings were normal. (R. at 571.)   Dr. Li assessed Chiari
malformation, syrinx of the spinal cord, chronic headache, and paresthesia of the arm that was
likely secondary to cervical syrinx.   (R. at 570.)   Dr. Li started Plaintiff on the medications,
Topiramate (Topamax) and Sumatriptan (Imitrex ) and noted if Plaintiff's symptoms worsen, she
would obtain a repeat MRI of Plaintiff's cervical spine.   (*Id.*)

On August 22, 2013, Plaintiff followed up with Dr. Li, complaining that her medications

were not helping her migraines, but she denied significant side effects from the medication.   (R. at 650.)   Plaintiff reported her headaches had worsened and she experienced between three and four headaches per week.   (*Id*.)   Her physical examination findings were normal.   (*Id*.)   Dr. Li adjusted Plaintiff's medications.   (*Id*.)

During a follow-up visit to Dr. Li on October 22, 2013, Plaintiff reported headaches.   (R. at 648.)   Dr. Li assessed Chiari malformation, posterior fossa decompression, chronic headaches, and syrinx of the spinal cord.   (*Id*.)

**F.     Robert Gewirtz, M.D.**

Plaintiff presented to Robert Gewirtz, M.D., on August 29, 2012, for a consultative examination, complaining of headaches, arm pain, and stumbling.   (R. at 534–35.)   Dr. Gewirtz noted that Plaintiff was "clearly myelopathic."   (R. at 534.)   He recommended decompressing the Chiari malformation and observing the syrinx.   (*Id*.)   Dr. Gewirtz advised that surgery may be necessary.   (*Id*.)

On September 14, 2012, Dr. Gewitz performed a suboccipital craniectomy with removal of the arch of Cl with Dural patch repair.     (R. at 552–54.)   Prior to being released from the hospital, Plaintiff underwent a CT of her brain on September 16, 2012 which showed status post craniectomy in the occipital region and resection of the posterior arch of C1 with trace pneumocephalus and no hydrocephalus or hemorrhage.   (R. at 562.)

On December 12, 2012, Plaintiff was seen by Dr. Gewirtz for her three month post-surgical follow-up.   (R. at 537.)   Dr. Gewirtz noted that Plaintiff "is doing great.   She has no headaches. Her wound looks fantastic.   She is very pleased with the results."   (*Id*.)   Dr. Gewirtz further

noted that Plaintiff's examination was normal and he was really pleased with how well she has done.   (*Id*.)   Dr. Gewirtz cleared Plaintiff for full activity.   (*Id*.)

**G.      Preeti Agrawal, M.D.**

On September 12, 2012, Plaintiff presented to Preeti Agrawal, M.D., complaining of headaches.   (R. at 599.)   Dr. Agrawal assessed Budd-Chiari syndrome.   (R. at 600.)

**H.      Jonathan Lee, M.D.**

On September 16, 2012, Johnathan Lee, M.D., performed a CT head scan without contrast. (R. at 538.)   Dr. Lee noted the posterior arch of C1 had been resected with the suboccipital caniectomy, a small amount of gas present within the surgical bed, a tiny amount of pneumocephalus, and fluid density accumulated in the region of resected bone.   (*Id*.)

**I.      Margaret Leonhard, Psy.D.**

On August 23, 2013, Plaintiff presented to Margaret Leonhard, Psy.D., for a psychological evaluation connected to her claim for mental disability benefits.   (R. at 583–89.)   Plaintiff reported severe migraines.   (R. at 583.)

**J.      Heather Dailey, CNP**

Plaintiff presented to Heather Dailey, CNP, on November 6, 2013, complaining of a sore throat at night, irritability, and depression, and seeking medication for her headaches and back pain.   (R. at 592.)   Upon physical examination, CNP Dailey noted that Plaintiff was oriented and in no acute distress.   (R. at 593.)   CNP Dailey assessed episodic tension headache, depression, and acute maxillary sinusitis. (*Id*.)

Plaintiff saw CNP Dailey on April 23, 2014, for follow-up of her chronic migraine headaches.   (R. at 695–96.)   Plaintiff reported that she has had daily headaches since her brain

surgery. (R. at 695.) Her current medication regime helps, but there is a constant dull ache present. (*Id*.) She has followed up with neurology and no other dysfunction or abnormalities were present. (*Id.*) Plaintiff's exam was normal and CFNP Dailey assessed headache. (R. at 695–96.)

Plaintiff presented to CFNP Dailey on May 30, 2014, complaining of an upper respiratory illness. (R. at 697.) Plaintiff reported her headaches as dull, but continual. (*Id*.) Upon examination, CFNP Dailey noted that Plaintiff was alert and in no acute distress. (R. at 698.) CFNP Dailey assessed acute sinusitis, hypertension, and episodic tension type headache. (R. at 698–99.) CFNP Dailey referred Plaintiff to another neurologist. (R. at 699.)

On September 11, 2014, Plaintiff followed up with CFNP Dailey for hypertension, migraines, and gastroesophageal reflux disease ("GERD"). (R. at 701–03.) CFNP Dailey assessed GERD, hypertension, and migraine. (R. at 702.)

Plaintiff followed up with CFNP Dailey on December 10, 2014, with concerns of hypertension. (R. at 704.) Upon examination, CFNP Dailey noted that Plaintiff was alert, oriented, and in no distress. (R. at 705.) CFNP Dailey assessed essential hypertension, neck pain, GERD, and migraine. (R. at 706.)

On March 31, 2015, Plaintiff reported to CFNP Dailey during an office visit that her headaches had gotten worse in the past month and they occur several times a week and lasting up to several days at a time. (R. at 711.) CFNP Dailey noted that Plaintiff's headaches were "moderately painful" and that Plaintiff "recognizes no specific triggering factors." (*Id*.) Plaintiff also reported the headaches occurred with no apparent pattern and were accompanied by anxiousness, nausea, and photophobia. (*Id*.) Upon physical examination, CFNP Dailey noted that

Plaintiff was alert, oriented, and in no distress. (R. at 712.) CFNP Dailey assessed headache, GERD, and an epidermal cyst. (R. at 713.) CFNP Dailey referred Plaintiff to another neurologist. (*Id*.)

On September 9, 2015, Plaintiff followed up with CFNP Dailey, complaining of continued headaches. (R. at 738–39.) Upon physical examination, CFNP Dailey noted that Plaintiff was in no distress. (R. at 739.) She assessed GERD, hypertension, type I arnold-Chiari malformation, and headache. (R. at 738.)

**K.** **Joseph Kearns, D.O.**

Joseph Kearns, D.O., performed a consultative exam Plaintiff for disability purposes on March 12, 2014. (R. at 686–91.) Plaintiff reported she suffered from migraines four to five times a week with each episode lasting one-half of the day to the entire day; numbness in her left arm; L4-5 bulging disc/annular tear/degenerative disc disease; daily pain in the left leg; and back spasms nearly every day. (R. at 686.) On examination, Dr. Kearns found elevated blood pressure, increased lumbar lordosis, tenderness in the lower half of the lumbar spine, and decreased sensation on the left lower extremity on pinwheel testing. (R. at 687.) Dr. Kearns diagnosed Chiari malformation, L4-5 disc bulge/annular tear/degenerative disc disease and hypertension. (*Id.*) Dr. Kearns opined that Plaintiff might need some accommodation at work: She should limit lifting to twenty pounds, limit bending and twisting of the spine to 1/3 of the day or less, limit moving her neck, and that she should be limited to a sedentary or light work position. (*Id.*) He noted that she would not be restricted to walking. (*Id.*)

**L.** **Leon Rosenberg, M.D.**

Plaintiff consulted with neurologist, Leon Rosenberg, M.D., on July 25, 2014, due to her

continued complaints of headaches.   (R. at 722–25.)   Plaintiff reported some relief with

medication, but reported she still gets severe headaches that come on suddenly and feel sharp.   (R.

at 722.)   She reported no known food trigger, but concentrating, missing sleep, or missing meals

were triggers.   (*Id*.)   Upon examination, Dr. Rosenberg found Plaintiff alert and in no acute

distress.   (R. at 723.)   Dr. Rosenberg's examination findings were normal and he diagnosed her

with migraine, chronic without aura.   (R. at 724.)   He ordered an MRA of her head.   (*Id*.)

**M.     Norman Jacobs, M.D.**

On August 8, 2014, Norman Jacobs, M.D., performed a MRA of Plaintiff's head, which

revealed no evidence of aneurysm, vascular malformation, or occlusive vascular disease.   (R. at

692.)   The distal left vertebral was not visualized suggesting developmental hypoplasia.   (*Id*.)

**N.     Daniel Schlie, M.D.**

Plaintiff saw primary care physician, Daniel Schlie, M.D. on March 12, 2015, for

follow-up for problems of hypertension, GERD, and migraines.   (R. at 707.)   Upon examination,

Dr. Schlie noted that Plaintiff was alert, oriented, and in no acute distress.   (*Id*.)   Dr. Schlie

assessed GERD, hypertension, and depression.   (R. at 708.)

On June 10, 2015, Plaintiff followed up with Dr. Schlie, complaining of hypertension,

GERD, and headache.   (R. at 716.)   Plaintiff sought a refill on all of her medications.   (*Id*.)   Dr.

Schlie noted that Plaintiff said "she needs a slip for human services indicating she is unable to

work for a period of six months.   I told her that I would limit her to sedentary work only."   (*Id*.)

Upon physical examination, Dr. Schlie noted that Plaintiff was alert, oriented, and in no distress.

(R. at 717.)   Dr. Schlie assessed her with hypertension, depression, and degenerative disc disease.

(*Id*.)

**O.     Amanda McConnell, D.O.**

On August 18, 2015, Plaintiff treated with neurologist, Amanda McConnell, D.O., and reported having three to six headaches a week.   (R. at 734.)   Plaintiff reported that she uses medication, Fioricet, and it helps the pain at times.   (*Id*.)   Plaintiff reported that she rarely experiences a prodrome to the headache and the headache is associated with other symptoms, including nausea, vomiting, photophobia, and phonophobia.   (*Id*.)   Dr. McConnell assessed chronic migraines and occipital neuralgia and recommended using Elavil to prevent headaches. (R. at 736.)

Upon examination on October 1, 2015, Plaintiff reported "having a few headaches a month now."   (R. at 731.)   Dr. McConnell reviewed Plaintiff's headache diary and noted that Plaintiff was, overall, "very happy with this.   She feels much better.   Headaches are easier to control." (*Id*.)   Dr. McConnell assessed chronic migraines.   (R. at 733.)   Dr. McConnell noted that Plaintiff was "well controlled" on her medication, would not make any changes to the medication, and that Plaintiff should follow up in four months.   (*Id*.)

**P.     Amanda Strickland, CNP**

On December 9, 2015, Plaintiff presented to Amanda Strickland, CNP, complaining of thoracic and lower back pain.   (R. at 788.)   Upon physical examination, CNP Strickland noted that Plaintiff was alert, oriented, and in no acute distress.   (R. at 789.)   CNP Strickland assessed back pain, hypertension, migraine, and GERD.   (R. at 790.)

**Q.     State-Agency Evaluations**

On October 2, 2013, Diane Manos, M.D., reviewed Plaintiff's medical record and determined Plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently;

standing/ walking about two hours in an eight-hour workday; and sitting about six hours in an eight

hour workday.   (R. at 193–95.)   She further opined that Plaintiff could occasionally climb ramps

and stairs; occasionally stoop, kneel, crouch, and crawl.   (R. at 194.)   However, Dr. Manos

opined that Plaintiff must never climb ladders, ropes, or scaffolds.   (*Id*.)   Dr. Manos explained

that the exertional limitations are based upon, *inter alia*, Plaintiff's Chiari malformation, syrinx of

spinal cord with paresthesia of the left arm, and consideration of Plaintiff's pain.   (R. at 194–95.)

Teresita Cruz, M.D. reviewed Plaintiff's medical record upon reconsideration in March

2014 and limited Plaintiff to light work with postural limitations and occasional overhead

reaching.   (R. at 224–26.)

## IV.    ADMINISTRATIVE DECISION

On February 25, 2016, the ALJ issued his decision.   (R. at 126–40.)   The ALJ found that

Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014.

(R. at 128.)   At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.   *See* 20 C.F.R. §416.920(a)(4).   Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

engaged in substantially gainful activity since June 4, 2012, the amended alleged onset date. (*Id.*) The ALJ found that Plaintiff had the severe impairments of status post craniotomy for a Chiari I malformation with syrinx; obesity; degenerative disc disease; migraine headache; and an affective disorder. (*Id.*) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 129.) At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she cannot climb ladders, ropes or scaffolds. She can frequently climb ramps or stairs, kneel or crouch, and can occasionally stoop or crawl. She can occasionally reach overhead with the both arms. In addition, the claimant can perform simple repetitive tasks as well as some multi-step tasks that do not involve a fast assembly line pace, strict production quotas or more than occasional contact with others.

(R. at 131.) In reaching this determination, the ALJ accorded "minimal weight" to the opinion of treating physician, Dr. Schlie, finding that

> While Dr. Schlie limited the claimant to sedentary work, it appears this was based primarily on her subjective complaints as he found normal findings on his examination (Exhibit 14F/9). Furthermore, he provided no specific functional limitations and apparently set forth the limitations for only six months. I note, however, that while the claimant requested that he say that she was disabled, he limited her to sedentary work instead.

(*Id.*) The ALJ accorded "some weight" to the consultative examiner, Dr. Kearns, and "some weight" to the opinions of the state agency reviewing physicians, that "[a]dditional evidence that entered the record after the reconsideration determination shows that the claimant should reasonably be limited to sedentary work as opposed to light work." (*Id.*)

The ALJ also considered Plaintiff's credibility as follows:

In this case, a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by claimant. The objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the range of work described above.

(R. at 134.)   The ALJ went on to note that the objective evidence did not support Plaintiff's subjective complaints and that "[t]he record contains inconsistent and exaggerated statements that further detract from the claimant's overall credibility."   (R. at 137.)   The ALJ concluded that, "while the claimant has medically determinable impairments that could reasonably cause some symptoms and limitations, the above evidence shows that the claimant's testimony regarding the extent of such symptoms and limitations is not fully credible."   (R. at 138.)

Relying on the VE's testimony, the ALJ determined that even though Plaintiff is unable to perform her past relevant work, other jobs exist in the national economy that Plaintiff can perform. (R. at 138–39.)   He therefore concluded that Plaintiff was not disabled under the Social Security Act.   (R. at 140.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").   Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

Plaintiff advances two related contentions of error. First, Plaintiff asserts that the ALJ erred when he did not assess any functional limitations related to her severe impairment of migraine headaches. (ECF No. 18 at 9–10.) Specifically, she contends that there is no evidence that any of the restrictions in the ALJ's RFC related to her migraine headaches, which she testified resulted in light and sound sensitivity, nausea, and dizzy spells. (*Id.*) Plaintiff therefore argues that the ALJ's finding that migraine headache was a severe impairment is inconsistent with his RFC, requiring remand. (R. at 10.) Plaintiff next argues the ALJ's RFC failed to account for her

off-task time and absence from work resulting from her migraine headaches.   (*Id.* at 11–17.)

Plaintiff bears the burden of providing the necessary medical evidence to demonstrate her impairments cause functional limitations resulting in disability.   20 C.F.R. §404.1512(c).   Where the ALJ has properly considered Plaintiff's evidence and substantial evidence supports his conclusion, "this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."   *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005.)

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."   *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).   The determination of RFC is an issue reserved to the Commissioner.   20 C.F.R. §§ 404.1527(e), 416.927(e).   Nevertheless, substantial evidence must support the Commissioner's RFC finding.   *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).   When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"   *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In

> assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Here, the ALJ thoroughly addressed and considered Plaintiff's migraine headaches and substantial evidence supports the ALJ's assessment of Plaintiff's RFC. At step two, the ALJ specifically found that migraine was a severe impairment, but concluded at step three that migraine did not meet or equal a listed impairment. (R. at 128–29.) At step four, the ALJ carefully considered the hearing testimony, the medical evidence, the medical opinions, and explained the bases for the limitations in his RFC. (R. at 131–38.) In doing so, the ALJ specifically noted that Plaintiff testified that her most disabling condition is her headaches and history of Chiari malformation. (R. at 135.) The ALJ thoroughly considered the medical evidence and treatment of these conditions as set forth in detail above. (R. at 135–38.) Specifically, the ALJ noted that Plaintiff complained to Dr. Li in August 2012 of headaches and associated symptoms of sensitivity, balance difficulty, nausea, dizziness, and blurred vision. (R. at 135, 573.) Dr. Li noted that a MRI revealed Chiari malformation and presence of cervical syrinx. (*Id.*)

Later the same month, Plaintiff complained of headaches, arm pain, and stumbling to Dr. Gewirtz, who recommended, and ultimately performed, surgical decompression of the Chiari malformation. (R. at 135–36, 552–54, 570.) Post-operative visits in September and October 2012 revealed that Plaintiff was doing well. (R. at 136.) On December 12, 2012, Plaintiff had a

normal examination and Dr. Gewirtz determined that she was "doing great" and cleared her for full activity. (R. at 136, 537.)

While Plaintiff reported headaches up to four times a week in August 2013, she demonstrated generally normal results upon examination. (R. at 136, 650.) In March 2014, a MRA of Plaintiff's head showed no evidence of aneurysm, vascular malformation, or occlusive vascular disease. (R. at 136, 692.) In April and July 2014, Plaintiff complained of headaches to CFNP Dailey and Dr. Rosenberg, but examinations revealed generally normal findings. (R. at 136, 695–96, 722–25.)

Plaintiff continued to see CFNP Dailey every few months with complaints of headaches. (R. at 136, 701–06, 711.) In March 2015, Plaintiff reported experiencing headaches several times a week that she characterized as "moderately painful." (R. at 136, 711.) Upon physical examination, CFNP Dailey noted that Plaintiff was alert, oriented, and in no distress. (R. at 712.) On August 18, 2015, Plaintiff reported to Dr. McConnell that she experienced three to six headaches a week. (R. at 136, 734.) Dr. McConnell assessed chronic migraines and occipital neuralgia and recommended Plaintiff use Elavil to prevent headaches. (R. at 736.) When Plaintiff returned to Dr. McConnell on October 1, 2015, she reported having a few headaches a month. (R. at 136, 731.) Dr. McConnell reviewed Plaintiff's headache diary and noted that Plaintiff felt much better and that her headaches are easier to control. (R. at 136, 733.)

After reviewing this record, the ALJ agreed that the medical evidence revealed that Plaintiff experienced headaches since her Chiari malformation repair. (R. at 136.) However, the ALJ went on to find that because objective testing generally showed normal results, he reasonably limited Plaintiff to no climbing of ladders, ropes or scaffolds, only frequent climbing of ramps and

stairs, frequently kneeling and crouching, occasional stooping and crawling, and occasional reaching overhead with the bilateral upper extremities because of these extremities. (*Id.*) Accordingly, the ALJ specifically considered Plaintiff's severe impairment of migraines and sufficiently accounted for any limitations related to that condition.

Plaintiff nevertheless insists that there is no evidence that any of these restrictions related to symptoms of her migraine headaches, namely, light and sound sensitivity, nausea, and dizzy spells. (ECF No. 18 at 9–10.) Plaintiff therefore argues that the ALJ's finding that migraine headache was a severe impairment is inconsistent with his RFC that does not include limitations for this impairment. (R. at 10.) This Court disagrees. Even if these limitations are unrelated to Plaintiff's severe impairment of migraine, it is not necessarily inconsistent to recognize migraine as a severe impairment and to articulate a RFC that does not contain any migraine-related limitations:

> The RFC describes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from—though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard* [*v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002)]. "A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other." *Yang v. Comm'r of Soc. Sec.*, No. 00–10446–BC, 2004 WL 1765480, at \*5 (E.D. Mich. July 14, 2004). *Howard* does not stand for the proposition that all impairments deemed "severe" in step two must be included in the hypothetical. The regulations recognize that individuals who have the same severe impairment may have different RFCs depending on their other impairments, pain, and other symptoms. 20 C.F.R. § 404.1545(e).

*Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *see also Wright v. Comm'r of Soc. Sec.*, No. 2:16-cv-297, 2017 WL 4339670, at \*2 (S.D. Ohio Sept. 29, 2017) ("Accordingly, the mere fact that the ALJ's RFC determination did not contain migraine-related limitations does not make the RFC inconsistent with the ALJ's finding at step two that Plaintiff's headaches

amounted to a severe impairment."); *Morris v. Comm'r of Soc. Sec.*, No.1:16-cv-433, 2017 WL 1159809, at *6 (W.D. Mich. Mar. 29, 2017) (rejecting contention of error that "if the ALJ found Plaintiff's migraines to be a severe impairment, then he was required to include limitations for that impairment in the RFC"); *Simpson v. Comm'r of Soc. Sec.*, No. 1:13-cv-640, 2014 WL 3845951, at *9 (S.D. Ohio Aug. 5, 2014) ("Thus, an individual can have a severe impairment, *i.e.*, one that more than minimally affects work ability, and still retain the RFC to do a wide variety of work. Put another way, the existence of a severe impairment says nothing as to its limiting effects."). For the reasons set forth above and addressed further below, the ALJ's RFC determination enjoys substantial support in the record and was not inconsistent simply because the ALJ determined migraine to be a severe impairment.

Plaintiff, however, goes on to contend that the RFC is not supported by substantial evidence because it has no limitation that Plaintiff would be absent from work or off-task because of her migraine headaches. (R. at 11–18.) In advancing this argument, Plaintiff specifically criticizes the bases for the RFC and the ALJ's credibility determination. (*Id.*)

Plaintiff's arguments are not well taken. "The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d

646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)).   Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."   *Walters*, 127 F.3d at 531.   Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record."   *Rogers*, 486 F.3d at 247 (internal quotation omitted).   An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   *Id.* at 248.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."   *Walters*, 127 F.3d at 531.   In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.   20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2016 WL 1119029 (March 16, 2016); *but see Storey v. Comm'r of Soc. Sec.*, No. 98-1628, 1999 WL 282700, at *3 (6th Cir. Apr. 27, 1999) ("[T]he fact that [the ALJ] did not include a factor-by-factor discussion [in his credibility assessment] does not render his analysis invalid.").

In evaluating Plaintiff's credibility with respect to his subjective claims, the ALJ must determine whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.   *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).   Second, if the ALJ finds that such impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.   *Kalmbach v. Comm'r or Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011).   Pursuant to SSR 16-3p, the ALJ must evaluate seven factors in determining credibility:

In addition to using all the evidence to evaluate the intensity, persistence, and

limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416(c)(3). These factors include:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of pain other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

SSR 16-3p tasks the ALJ with explaining his or her credibility determination with sufficient specificity as "to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brothers v. Berryhill*, Case No. 5:16-cv-01942, 2017 WL 29125, at *11 (N.D. Ohio June 22, 2017) (citing *Rogers*, 486 F.3d at 248).

Here, the ALJ reasonably discounted Plaintiff's allegations of the severity of the pain and degree of functional limitations caused by her migraines based upon a number of different factors. While Plaintiff criticizes the ALJ's consideration of the lack of objective evidence substantiating the severity of her migraines, the United States Court of Appeals for "the Sixth Circuit has affirmed the denial of benefits in cases involving complaints of migraine pain which were unsupported by objective medical evidence." *Connell v. Comm'r of Soc. Sec.*, No. 17-cv-82, 2018 WL 1250031, at *3 (S.D. Ohio Mar. 12, 2018) (collecting cases). Accordingly, "the ALJ

24

did not err in relying on the lack of objective evidence as one factor in discounting Plaintiff's credibility regarding the limiting effects of her migraines." *Donerson v. Comm'r of Soc. Sec.*, No. 1:16-cv-3028, 2017 WL 6987958, at *7 (N.D. Ohio Dec. 28, 2017), *adopted by* 2018 WL 454392 (N.D. Ohio Jan. 16, 2018).

Plaintiff next complains that the ALJ erred in concluding that her activities of daily living conflicted with her allegations of the debilitating nature of her migraines.   (ECF No. 18 at 14–15.) The Court disagrees.   The ALJ reasonably considered the record evidence reflecting her activities of daily living when weighing the credibility of Plaintiff's allegations of debilitating pain.   *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain."); *Walters*, 127 F.3d at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.").   The ALJ specifically noted Plaintiff's ability to take care of her children, drive a car, shop, and perform light household chores.   (R. at 137.)   The ALJ further noted that Plaintiff reported increased exercise in September 2015, all of which the ALJ found inconsistent with Plaintiff's allegations and headache logs that purported to demonstrate the frequency of those episodes.   (*Id*.)   The ALJ therefore did not err in considering Plaintiff's daily activities when assessing her credibility.   *See Weaver v. Comm'r of Soc. Sec.*, No. 1:14-cv-1156, 2016 WL 184408, at *6–7 (W.D. Mich. Jan. 15, 2016) (finding no error in RFC where ALJ thoroughly addressed limitations posed by Plaintiff's migraines and seizures and noting that Plaintiff "was able to complete a wide range of activities").

Plaintiff also faults the ALJ for taking into consideration the fact that she only had conservative her conservative treatment for her migraines when discounting her allegations of disabling pain. (ECF No. 18 at 13–14.) However, this was just one of several factors that the ALJ considered and he did not err in weighing this as a factor in discounting her credibility. *See Tennant v. Comm'r of Soc. Sec.*, No. 2016 WL 5799164, at *4 (W.D. Mich. Oct. 5, 2016) (finding no error with ALJ's credibility assessment where the ALJ considered the claimant's conservative treatment for migraines as one of several factors); *Kelley v. Comm'r of Soc. Sec.*, No. 1:15-CV-0107, 2016 WL 944906, at *4 (W.D. Mich. Mar. 14, 2016) (considering conservative treatment for migraines as one of several factors in weighing claimant's credibility).

The ALJ also reasonably considered inconsistencies in the record regarding the frequency and debilitating effect of her migraines:

> The claimant testified to continuing headaches but in a recent treatment note from October 2015, she reported only having a few migraines a month and reported that they were easier to control (Exhibit 17F/2). In April 2014, the claimant reported that she had daily headaches since her brain surgery, yet in post-operative notes, it shows that she initially denied headaches after her surgery (Exhibit 5F/4). In addition, in November 2013, the claimant reported only intermittent headaches that responded to medication (Exhibit l0F/3), in September 2014, the claimant reported occasional headaches (Exhibit 13F/8) and in March 2015, the claimant reported that her headaches tend to be moderately painful (Exhibit 14F/3).

> Although the inconsistent/exaggerated information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless, such statements suggest that the information provided by the claimant generally may not be entirely reliable.

(R. at 137–38.) The Court finds no error in the ALJ's consideration of this factor. *See Carter v. Comm'r of Soc. Sec.*, No. 16-cv-13204, 2017 WL 2546506, at *13 (E.D. Mich. June 12, 2017) ("Review of the record clearly supports the ALJ's finding that [the claimant's] testimony is internally inconsistent and less than credible."); *Farris v. Astrue,* No. 4:10–CV–62, 2011 WL

2749519, at *11 (E.D. Tenn. June 15, 2011) (considering the claimant's inconsistent statements regarding the effectiveness of her medication and frequency of her headaches when assessing claimant's credibility).

In addition, the record reflects no opinion of disability or limitation such as time off-task or absence from work due to Plaintiff's migraines, which further supports the ALJ's credibility assessment and his RFC that did not accommodate for such limitations. *See Campbell v. Colvin*, No. 5:14-cv-526, 2015 WL 631191, at *16 (N.D. Ohio Feb. 12, 2015) (considering that the claimant did not point to any physician opinion evidence that supports functional limitations of time off-task or absence from work due to migraine headaches); *Ditmer v. Astrue*, No. 1:10–CV–877, 2012 WL 642851, at *5 (S.D. Ohio Feb. 28, 2012) (finding "no medical source opinions, of any kind, that indicate that Plaintiff's migraine headaches will cause excessive absenteeism" and "having discounted Plaintiff's credibility on the limitations imposed by her headaches, there was no evidentiary basis upon which to conclude that she would experience excessive absenteeism").

In sum, the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record, is supported by substantial evidence and is therefore entitled to "great weight and deference." *Infantado*, 263 F. App'x at 475. While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for his determination, which enjoys substantial support in the record. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.").

## VII. CONCLUSION

In conclusion, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.   Accordingly, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

The Clerk is directed to enter final judgment.


Date:   March 27, 2018                              _____/s/ *Elizabeth A. Preston Deavers*_____
                                                                ELIZABETH A. PRESTON DEAVERS
                                                                CHIEF UNITED STATES MAGISTRATE JUDGE